## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOSHUA RUPNOW, PETER SZOSTAK, and all others similarly situated, | ) ) ) | Civ. No. _____ |
| Plaintiffs, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| E*TRADE SECURITIES, LLC., | ) ) | |
| Defendant. | ) ) ) | |

Plaintiffs Joshua Rupnow, and Peter Szostak ("Plaintiffs") allege the following, upon personal knowledge as to their own acts, and upon information and belief derived from, among other things, investigation of counsel and review of public documents, as to all other matters:

### NATURE OF THE CASE

1.      This is a class action lawsuit alleging a claim of breach of contract on behalf of the customers of E*TRADE Securities LLC ("eTrade"), who were charged undisclosed interest on short sales of "hard-to-borrow" securities between November 26, 2013, and October 15, 2019.

2.      Pursuant to the contract between securities broker-dealer eTrade, and its brokerage customers (the "Agreement"), eTrade promises to disclose prior to executing a short sale an indicative interest rate for the short sale of hard-to-borrow securities in the preview trade window. In violation of its express contractual obligation, eTrade did not, until October 15, 2019, disclose that the security being shorted was hard-to-borrow, and did not disclose before the trade was placed, what the estimated interest rate would be.  The Agreement is attached as Exhibit A to this complaint.

3.      As customers discover only after placing the trade, the interest rate in many instances is shockingly high. When annualized, the rates have at times exceeded hundreds of percent.  The charged interest is automatically deducted from customer accounts, and is much higher than the fee schedule that eTrade makes available online to its customers, which is what customers agree to pay.

4.      Plaintiffs and the Class members were damaged by having extra-contractual interest taken directly from their brokerage accounts. Plaintiffs and the Class seek relief on behalf of all eTrade customers in the United States who were charged interest on hard-to-borrow securities, but who did not receive an estimated interest rate prior to the trade being executed, in breach of an express contractual provision.

## THE PARTIES

5.      Plaintiff Joshua Rupnow is a resident and citizen of Oregon. Rupnow has an investment account on Defendant's platform, which he opened in 2017.  On January 26, 2018, after a series of short sales by the Plaintiff between December 2017 and January 2018, Plaintiff's eTrade account was charged hard-to-borrow interest. The "hard-to-borrow" interest rate was not enumerated in any way on eTrade's online trading platform ahead of Plaintiff Rupnow's placement of the short trades, on which he incurred high interest charges on hard-to-borrow securities. For example, eTrade deducted $400.17 in hard-to-borrow interest from Plaintiff Rupnow's account on January 26, 2018, for short trades during the month of January 2018.  The monthly statements on which the charges are reflected does not indicate which short sales resulted in the hard-to-borrow interest; neither the security nor the interest rate nor the particular dollar amount is indicated. Plaintiff, like all class members, was not given the option of disputing the borrowing fees: they were simply removed from his brokerage account.

6.      Plaintiff Peter Szostak is a resident and citizen of Indiana. Szostak has an investment account on Defendant's platform, which he opened in December 2018.  Plaintiff Szostak shorted numerous stocks through his eTrade account and incurred high hard-to-borrow interest on several occasions.  The "hard-to-borrow" interest rate was not enumerated in any way on eTrade's online trading platform ahead of Plaintiff Szostak's placement of the short trades. Plaintiff Szostak incurred hard-to-borrow interest charges of $1,829.03 in June 2019, $624.17 in July 2019, and $568.66 in August 2019.  The monthly statements on which these charges are reflected does not indicate which short sales resulted in the hard-to-borrow interest; neither the security nor the interest rate nor the particular dollar amount is specified.  The statements simply state, for example, "hard to borrow interest from 7/20 to 8/19 . . .  568.66."  Plaintiff, like all class members, was not given the option of disputing the borrowing fees: they were simply removed from his brokerage account.

7.      Defendant eTrade is a limited liability company registered in Delaware and domiciled in the state of New York, with its headquarters and principal place of business at 11 Times Square, 32nd Floor, New York, New York 10036.  eTrade is one of the largest online-focused broker-dealer in the world and has over 30 brick-and-mortar locations across the United States. It also offers other financial products and services including online banking.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs and the Defendant are diverse and there are more than 100 class members in many different states and the aggregate amount in controversy exceeds $5,000,000.

9.      Venue is proper in this Court pursuant to 28 USCS § 1391(b)(1) and (b)(2)because Defendant is a resident of this District and indeed maintains its headquarters in this District, and

because a substantial part of the events giving rise to Plaintiffs' claim occurred in this District. The agreement between Defendant and its customers, which is identical for all customers including Plaintiffs, contains a New York choice of law clause stating that "The Account Holder understands that this Customer Agreement will be deemed to have been made in the State of New York and will be construed, and the rights and liabilities of the parties determined, in accordance with the internal laws of the State of New York."  Accordingly, venue is proper because Defendant's headquarters/principal place of business is located in this District, and because the agreement is deemed to have been made in New York.

## SUBSTANTIVE ALLEGATIONS

**A.      ESTABLISHING AN eTRADE ACCOUNT, SHORT SELLING, AND HARD-TO-BORROW SECURITIES**

10.     To become eTrade brokerage customers, users must agree to the contractual terms in the Agreement. These terms govern everything from the way trades are executed to the fees involved with various types of trading.  It is a form contract, uniform for every eTrade brokerage customer.

11.     Pursuant to the Agreement, customers agree to pay all fees and charges based on the applicable "Fee Schedule". In its entirety, the "Fees and Commissions" section of the Agreement reads as follows:

> Fees and Commissions The Account Holder agrees to promptly pay all brokerage commissions, charges, securities-borrowed fees, regulatory pass-through fees, and other fees as may be applicable to the Account or any transaction in the Account based on the then-effective Fee Schedule. The Fee Schedule may require a minimum Account balance, assess fees for inactive Accounts, and assess fees for Account terminations or transfers. In addition, the Account Holder agrees to pay all taxes applicable to the Account, any transaction in the Account, or the use of any Service. The Account Holder authorizes E*TRADE to automatically debit the Account for any such brokerage commissions, charges, fees, and taxes.

> ***The Account Holder understands that the Account Holder will be provided with an indicative "borrow rate" for a hard-to-borrow security at the time the Account Holder previews a short sell order for that security but that the actual "borrow rate" for the security may be different.***
>
> The Fee Schedule is available on the E\*TRADE website and is incorporated by reference into this Customer Agreement. E\*TRADE may modify the Fee Schedule at any time, at its sole discretion, and such fees will be applicable to the Account as of the effective date of such amendment.

Agreement at 3 (emphasis added).

12.     The Fee Schedule can be found at: "https://us.etrade.com/what-we-offer/pricing-and-rates." [1]  The Fee Schedule discloses the rate that customers will pay to borrow money from eTrade with which they can buy, or sell short, securities.  In the securities context such borrowed money is referred to as "margin."  On November 11, 2019, for example, the Fee Schedule provided that the base "margin rate" (the interest customers would pay eTrade on borrowed money) was 7.75%, with the rate declining as the amount borrowed increases.

13.     Short selling is when a trader/investor borrows a stock from a brokerage, sells that stock, and then, later, purchases the stock back in order to return it to the lender.   All short selling requires the use of margin; that is, all short selling requires that the short seller borrow money from eTrade on which the short seller will pay interest.

14.     Unlike the typical "long" investor who hopes for an increase in the price of the purchased security, the short seller hopes the price falls so that the stock can be bought back for less than it was sold.  Sometimes a broker's supply of shares that can be loaned to short sellers cannot meet the demand. In such cases, the security will be deemed hard-to-borrow.  Typically, this occurs with shares of companies that are heavily shorted.  eTrade charges interest rates on loans of hard-to-borrow securities that far exceeds the rates disclosed in the Fee Schedule.

---

[1] Last checked November 13, 2019.

15.     The interest on hard-to-borrow securities is not disclosed in the Fee Schedule. Instead, pursuant to the Agreement, eTrade is obligated to give customers -- *before a trade of any hard-to-borrow security is placed* – an indicative borrow rate for that security:

> [t]he Account Holder …  will be provided with an indicative 'borrow rate' for a hard-to-borrow security at the time the Account Holder previews a short sell order for that security but that the actual 'borrow rate' for a security may be different.

Agreement at 3.

16.     Yet, prior to October 15, 2019, eTrade did not indicate ahead of a customer placing the trade that the security was hard-to-borrow, much less what the indicative borrow rate would be.  Plaintiffs and other members of the Class had no indication of how much they would be paying.

17.     Upon information and belief, eTrade finally did what it said it would do after October 15, 2019, and had not done until then: it now informs customers in the trade preview window that the security they are shorting is hard-to-borrow and what the indicative borrow rate is going to be.

18.     As such, the Defendant for years had not displayed in the trade preview trade window that the security was "hard-to-borrow" or indicate the amount of the hard-to-borrow interest. This is in direct contravention to the Agreement, which states that the Account Holder would be provided with an indicative "hard-to-borrow" at the time the Account Holder previews the short sell order.

19.     This breach of eTrade's express contractual obligation is compounded by eTrade's deduction of fees from customer brokerage accounts, which deprives customers of the ability to easily dispute the fees.  Unlike, for example, a telephone company that sends out a monthly bill that requires customers to affirmatively pay the requested amounts, and therefore offers customers an ability to dispute the charges, eTrade does not send out a bill, it deducts the charges from the

account. Accordingly, eTrade's customers do not have a meaningful opportunity to dispute charges before they are incurred/deducted from their accounts.

20.     Pursuant to the express terms of Agreement, eTrade was authorized to charge customers only those fees "based on the then-effective Fee Schedule," with the exception being interest on hard-to-borrow securities which was not covered by the Fee Schedule, but which eTrade stated it would show customers "at the time the Account Holder previews a short sell order." Agreement at 3.

21.     While the Agreement allows eTrade to amend the Fee Schedule the interest charged on hard-to-borrow securities is not an amendment to the Fee Schedule.  Indeed, the Fee Schedule does not speak to interest on hard-to-borrow securities, rather, as alleged above, hard-to-borrow securities are covered by another express provision obligating eTrade to estimate for customers the higher, non-Fee Schedule interest rate on hard-to-borrow securities before they place their trades.  eTrade does not do this. Instead, it charges interest much higher than the Agreement allows, and tells customers about it only after imposing it on them.

## B.     PLAINTIFF SZOSTAK WAS CHARGED HARD-TO-BORROW FEES IN BREACH OF THE AGREEMENT

22.     In 2019, Plaintiff Szostak shorted certain securities in June, July, and August. Contrary to eTrade's express obligation, he was not informed at the time he placed the short trades that the securities were hard-to-borrow, or what the indicative rate would be.  He was charged $1,829.03 in June, 2019, $624.17 in July, 2019, and $568.66 in August, 2019. These charges are identified on his monthly statements as "hard to borrow interest."

23.     Plaintiff Szostak did not agree to pay hard-to-borrow interest that was not disclosed to him prior to his placement of the trade, as eTrade was obligated to do under its contract.

Nevertheless, his account was debited by $1,829.03 in June, 2019, $624.17 in July, 2019, and $568.66 in August, 2019.

24.     In June 2019, Plaintiff Szostak shorted the stock of Beyond Meat, Inc., which traded under the symbol "BYND." After becoming aware that the stock was hard-to-borrow following news reports about how heavily shorted the stock had become, on June 10, 2019, Plaintiff Szostak communicated with eTrade customer representatives using eTrade's messaging program, which allows customers to ask questions in real time through a chat window on eTrade's website.  He asked the customer representative what the borrow rate was on a BYND short sale. Despite Defendant's express contractual obligation to tell customers what the estimated rate was ahead of their placing a trade, Mr. Szostak was told by eTrade's customer service representative that it was not available on the eTrade online platform. The customer representative told Plaintiff Szostak that to find out the rate, the customer representative would have to check with the "Stock Loans team." After checking, the customer representative said the rate was currently "350%."

25.     Mr. Szostak initiated another message chat with eTrade customer service the following day (June 11, 2019) to ask the same question. This time, he was transferred by the customer service representative to a trader, who told him that he estimates that the borrow rate to short BYND shares was 300%.  The trader confirmed that the only way for customers to get the rate is to communicate with a trader, by first initiating contact with customer service representative, who then would need to contact the stock lending department.

26.     In other words, contrary to Defendant's express contractual obligation to display an estimate of the hard-to-borrow rate ahead of a customer's placement of the trade, the only way to find out the rate is to contact eTrade.

27.     Mr. Szostak contacted eTrade again on June 12, 2019, to confirm whether there was another way for him to know the hard-to-borrow interest rate other than by communicating with multiple eTrade employees. The customer representative confirmed there was not, and stated that because hard-to-borrow rates can change frequently there is no way to post those online accurately.

28.     This explanation was, however, untrue. Other brokers, including, for example, Interactive Brokers, indicated an estimated rate ahead of the trade being placed. And, indeed, eTrade could always have done so, as is evident by the fact that, starting in October 2019, it finally began to do what it had been obligated to do for years: display estimates of the hard-to-borrow rate in the trade preview window.   The preview window now looks as follows:



29.     Plaintiff Szostak called customer service on November 5, 2019, to ask about the change. He was told by the customer service representative that the change was effectuated October 15, 2019.

30.     eTrade had profited for years from its extra-contractual interest on hard-to-borrow securities. The interest it charges on short sales is split, with a portion going to the owner of the stock, and a portion going to eTrade. The higher the interest the more money eTrade makes.

## C.    PLAINTIFF RUPNOW WAS CHARGED HARD-TO-BORROW FEES IN CONTRAVENTION TO THE BROKERAGE AGREEMENT

31.     On January 26, 2018, after a series of short sales by the Plaintiff between December 2017 and January 2018, Plaintiff's eTrade account was charged "hard-to-borrow" interest totaling $400.17.  The fact that the security he shorted (Eastman Kodak) was hard-to-borrow was not disclosed to Plaintiff Rupnow before he placed his trade.

32.     Plaintiff Rupnow did not agree to pay hard-to-borrow interest that was not disclosed to him as eTrade was obligated to do under its contract. Nevertheless, his account was deducted $400.17 in hard-to-borrow interest.

## <u>CLASS ACTION ALLEGATIONS</u>

33.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23(b)(3), defined as follows:

> All persons in the United States who, between November 26, 2013, and October 15, 2019, were charged "hard-to-borrow" interest fees by eTrade as a result of short selling securities on the eTrade platform.

34.     Excluded from the class are Defendants, any parents, subsidiaries, or affiliates of the Defendant or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of the Defendant, any justice, judge or magistrate judge of the United States who may hear this case, and all other persons related to any such judicial officer as defined by 28 U.S.C. 455(b).

35.     <u>Numerosity</u>. The Class members are so numerous and dispersed nationwide that joinder of all members is impracticable.

36.     Upon information and belief, the Class members likely number into at least the thousands and "hard-to-borrow" interest was charged on hundreds of thousands of transactions.

37.     <u>Commonality</u>. There are numerous and substantial questions of law and fact that are common to all members of the Class, which predominate over any questions affecting only individual Class members. All members of the Class were subjected to the same practices of the Defendant accused of herein.

38.     <u>Commonality and Predominance</u>:  Questions of law and fact exist that are common to the class, and predominate over any questions affecting individual class members, such that their resolution would resolve them for all members of the Class. The Agreement contains a New York choice of law clause, such that New York law will apply to the nationwide class. The Agreement at issue in this case is a form agreement applicable to Plaintiffs and each member of the Class, and eTrade's conduct was uniform in all relevant respects to each member of the Class. Common and predominant issues include:

(a)     Whether Defendant was required to disclose an estimated hard-to-borrow interest rate before Plaintiffs and other members of the Class entitled short sale orders over eTrade's online platform;

(b)     whether Defendant breached their contracts with Plaintiffs and the Class by charging interest on hard-to-borrow securities without disclosing an estimated interest rate;

(c)     whether Plaintiffs and the Class have been damaged, and, if so, what types of damages flow from Defendant's unlawful conduct; and,

(d)     the appropriate measure of damages and remedies against the Defendant and the nature and extent to which any other remedies, including equitable relief, apply to the harm done to the Plaintiffs and the Class.

39.     Typicality. Plaintiffs' claims are typical of the claims of all other members of the Class because their claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by the Defendant.

40.     Adequacy. Plaintiffs will fairly and adequately protect the interests of all members of the Class in the prosecution of this Action and in the administration of all matters relating to the claims stated herein. Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent. Plaintiffs have retained counsel experienced in handling class action litigation. Neither Plaintiff nor their counsel have any interest which might cause them not to pursue this action vigorously.

41.     Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual joinder of all the Class members is impracticable. Even if individual Class members were able to afford litigation, it would be unduly burdensome to the Courts in which the individual litigants would proceed. Defendant has subjected the Class to the same violations referenced herein.

42.     Manageability: The proposed class is easily identifiable from Defendant's records, and management of this case as a Class action would present no difficulties because all class members are in the same position, there is only one defendant, and the law of New York would apply to all claims.

43.     Accordingly, class certification is appropriate under Rule 23 because common issues of law and fact regarding Defendant's uniform violations predominate over individual

issues, and class certification is a superior method of resolving these claims. No unusual difficulties are likely to be encountered in the management of this action as a class action. Defendant acted in a manner that is generally applicable to all members of the Class, making final injunctive relief appropriate.

44.     Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

45.     Likewise, each of the issues identified above, are appropriate for class certification pursuant to Rule 23(c)(4) (issue certification), if the Court determines that not all of the issues in this case are appropriate for class treatment. The resolution of such discreet issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**COUNT I**

**BREACH OF CONTRACT**
**Pursuant to New York Law**
**On Behalf of Plaintiffs and All Other Members of the Class**

46.     Plaintiffs fully incorporate by reference each of the above paragraphs as though fully set forth herein.

47.     The Agreement is a binding contract for consideration between Plaintiffs and Defendant, pursuant to which Plaintiffs paid for and received securities brokerage services.

48.     Pursuant to the Agreement, Plaintiffs agreed to pay "all brokerage commissions, charges, securities-borrowed fees, regulatory pass-through fees, and other fees as may be applicable to the Account or any transaction in the Account based on the then-effective Fee Schedule." Agreement at 3.

49.     As to interest rate on shorting hard-to-borrow securities, the Agreement stated that eTrade would "provide … an indicative 'borrow rate' for a hard-to-borrow security at the time the Account Holder previews a short sell order for that security . . ." *Id.*

50.     eTrade breached that contractual obligation and charged Plaintiffs interest charges that were not authorized by the Agreement because eTrade did not provide an indicative "borrow rate" at the time the Plaintiffs previewed a short sale for that security, and because that higher rate was not otherwise disclosed on the Fee Schedule.  Indeed, eTrade did not identify that the security being shorted was hard-to-borrow, prior to Plaintiffs executing trades.

51.     Plaintiffs and the Class fulfilled all of their obligations under their respective Agreement(s) with the Defendant.

52.     The damages – in the form of hard-to-borrow interest fees – sustained by the Plaintiffs and the Class as described herein were the direct and proximate result of eTrade's breaches of their contracts with their customers.

## **RELIEF REQUESTED**

53.     WHEREFORE, Plaintiffs Rupnow and Szostak, on behalf of themselves and the Class, request the following relief:

A.     An order certifying that this Action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed Class Representatives, and that Plaintiffs' counsel be appointed Class Counsel;

B.     An award of money damages equal at least to the difference between the interest rates disclosed on the Fee Schedule and the higher interest charged by eTrade on hard-to-borrow securities;

C.     An award of reasonable attorneys' fees and costs; and,

D.     Such other relief at law or equity as this Court may deem to be just and proper.

## DEMAND FOR JURY TRIAL

54.     Plaintiffs and the Class hereby demand a trial by jury on all claims so triable.


Dated:   November 26, 2019

**MILBERG PHILLIPS GROSSMAN LLP**


*/s/Andrei V. Rado*

Andrei V. Rado
arado@milberg.com
Kent Bronson
kbronson@milberg.com
One Pennsylvania Plaza, Suite 1920
New York, New York 10119-0165
Telephone: (212) 594-5300
Facsimile:  (212) 868-1229

**SILVER LAW GROUP**
Scott Silver
ssilver@silverlaw.com
11780 W. Sample Road
Coral Springs, Florida
Telephone: (954) 755-4799
Facsimile:  (954) 755-4684

***Attorneys for Plaintiffs***