UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
:
JOSHUA RUPNOW, PETER SZOSTAK, :
and others similarly situated, :
:
Plaintiffs, :   19-CV-10942 (VSB)
:
- against - :   **OPINION & ORDER**
:
:
E*TRADE SECURITIES, LLC., :
:
Defendant. :
:
----------------------------------------------------------X

Appearances:

Andrei V. Rado
Milberg Phillips Grossman LLP
New York, New York
*Counsel for Plaintiffs*

Marc L. Greenwald
Quinn Emanuel Urquhart & Sullivan LLP
New York, New York
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

  Before me is the motion filed by Defendant E*TRADE Securities LLC ("E*TRADE") to dismiss the class action complaint filed by Plaintiffs Joshua Rupnow and Peter Szostak ("Plaintiffs"). (Docs. 12–14.) Because I find that Plaintiffs' class claim is not preempted by the Securities Litigation Uniform Standards Act, E*TRADE's motion to dismiss is DENIED.

  **I.**   **Factual Background**[1]

  This case involves short selling— "when a trader/investor borrows a stock from a

---

[1] The facts contained in this section are based upon the factual allegations set forth in Plaintiffs' class action complaint ("Complaint") filed on November 26, 2019. (Doc. 1.) I assume the allegations the Complaint to be true

brokerage, sells that stock, and then, later, purchases the stock back in order to return it to the lender." (Compl.[2] ¶ 13.)  The short selling trades in this case took place on E*TRADE, one of the largest online-focused broker-dealers in the world.  (*Id*. ¶ 7.)

Pursuant to the agreement between E*TRADE and its users ("Agreement"), people who invest through E*TRADE agree to pay all fees and charges related to their trading as set forth in the "Fee Schedule."  (*Id*. ¶ 11.)  The "Fee Schedule" also specifies the rate of interest that customers will pay if they borrow money from E*TRADE with which to buy, or sell short, securities.  (*Id*. ¶ 12.)  "In the securities context such borrowed money is referred to as 'margin.'" (*Id*.)  Specifically, the "Fees and Commissions" section of the Agreement reads as follows:

> Fees and Commissions The Account Holder agrees to promptly pay all brokerage commissions, charges, securities-borrowed fees, regulatory passthrough fees, and other fees as may be applicable to the Account or any transaction in the Account based on the then-effective Fee Schedule. The Fee Schedule may require a minimum Account balance, assess fees for inactive Accounts, and assess fees for Account terminations or transfers. In addition, the Account Holder agrees to pay all taxes applicable to the Account, any transaction in the Account, or the use of any Service. The Account Holder authorizes E*TRADE to automatically debit the Account for any such brokerage commissions, charges, fees, and taxes.
>
> *The Account Holder understands that the Account Holder will be provided with an indicative "borrow rate" for a hard-to-borrow security at the time the Account Holder previews a short sell order for that security but that the actual "borrow rate" for the security may be different.*
>
> The Fee Schedule is available on the E*TRADE website and is incorporated by reference into this Customer Agreement.  E*TRADE may modify the Fee Schedule at any time, at its sole discretion, and such fees will be applicable to the Account as of the effective date of such amendment.

(*Id*. ¶ 11 (emphasis original).)

---

in considering the motions to dismiss pursuant to Federal Rule of Civil Procedure Rule 12(b)(6).  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." refers to Plaintiffs' Complaint.

In short selling parlance, a security is "hard-to-borrow" when a broker's supply of shares that can be loaned to short sellers cannot meet the demand. (*Id*. ¶ 14.) This usually happens to heavily shorted stocks. (*Id*.) The rate E*TRADE charges on loans of hard-to-borrow securities is not disclosed in the Fee Schedule. (*Id*. ¶ 15.) Instead, pursuant to the Agreement, users "will be provided with an indicative 'borrow rate' for a hard-to-borrow security at the time [they] preview[] a short sell order for that security." (*Id*.)

Plaintiff Rupnow opened an investment account on E*TRADE in 2017. (*Id*. ¶ 5.) He made a series of short trades between December 2017 and January 2018. (*Id*. ¶¶ 5, 31.) At the time he placed these short trade orders, he was not informed that any of these securities were hard-to-borrow. (*Id*. ¶ 31.) However, $400.17 in hard-to-borrow interest was later deducted from his account. (*Id*. ¶ 32.) The hard-to-borrow interest rate was not enumerated in any way on E*TRADE's online trading platform prior to the trades, nor do the monthly statements on which the charges are reflected indicate which short sales resulted in the hard-to-borrow interest. (*Id*. ¶ 5.) Rupnow never agreed to pay such interest. (*Id*. ¶ 32.) The money charged was "simply removed from his brokerage account," (*id*. ¶ 5), and he did not have a meaningful opportunity to dispute the charge before it was deducted, (*id*. ¶ 19).

Plaintiff Szotak opened an investment account on E*TRADE in 2018. (*Id*. ¶ 6.) He shorted certain securities in June, July, and August 2019. (*Id*. ¶ 22.) At the time he placed these short trades, he was not informed that the securities were hard-to-borrow and was not provided with an indicative rate. (*Id*.) However, he was charged $1,829.03 for the trades in June, $624.17 for trades in July, and $568.66 for trades in August; these charges were identified on his monthly statements as "hard to borrow interest" and the money was "simply removed from his brokerage account." (*Id*. ¶¶ 6, 22.)

In June 2019, Szotak shorted a certain company's stock and later became aware through news reports that the stock had been hard-to-borrow at the time he shorted the stock. (*Id.* ¶ 24.) On June 10, 2019, he communicated with the E*TRADE customer representatives through E*TRADE's live chat messaging on its website. (*Id.*) He asked a customer representative about the borrow rate for that particular company stock and was told that the rate "was not available on the E*TRADE online platform" and that the customer representative would have to check with the "Stock Loans team" to get the borrow rate. (*Id.*) After checking, the customer representative informed Szotak that the rate was currently "350%." (*Id.*)

The following day, June 11, 2019, Szotak initiated another chat with a customer representative and asked the same question. (*Id.* ¶ 25.) He was transferred to a trader, who told him that the borrow rate was estimated at 300%. (*Id.*) The trader also confirmed that the only way for customers to learn the rate is to communicate with a trader by first initiating contact with a customer service representative, who then would need to contact the stock lending department. (*Id.*)

E*TRADE did not disclose the hard-to-borrow nature of the traded security or the indicative borrow rate prior to trades to its customers until October 2019, when it began to display estimates of the hard-to-borrow rate in the trade preview window. (*Id.* ¶¶ 2, 28.)

Plaintiffs filed this class action against E*TRADE on behalf of its customers who were charged undisclosed interest on short sales of "hard-to-borrow" securities between November 26, 2013, and October 15, 2019. (*Id.* ¶¶ 1, 33–45.) Plaintiffs assert a breach of contract claim for E*TRADE's failure to perform its obligation under the Agreement to disclose the indicative borrow rate in a preview window prior to the short selling trades.[3] (*Id.* ¶¶ 46–52.)

---

[3] The Complaint alleges that E*TRADE disclosed neither that the securities transacted included hard-to-borrow securities nor the applicable indicative rates. (Compl. ¶ 2.) However, Defendant's motion to dismiss alleges that the

## II.  Procedural History

Plaintiffs filed their Complaint on November 26, 2019.  (Doc. 1.)  On March 5, 2020, Defendant E*TRADE filed its motion to dismiss the Complaint.  (Doc. 12.)  On April 14, 2020, Plaintiffs filed their opposition to Defendant's motion to dismiss.  (Doc. 23.)  On April 28, 2020, Defendant filed its reply.  (Doc. 26.)

## III.  Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Plausibility . . . depends on a host of considerations:  the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.  *Kassner*, 496 F.3d at 237.  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).  Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Id.*  A complaint is "deemed to include any written instrument attached to it as an

---

investors were in fact notified that the securities they transacted were hard-to-borrow.  (Doc. 13 at 13 n.5.)  Although Plaintiffs do not seem to challenge Defendant's assertion, such a factual issue is not ripe for decision on a motion to dismiss.  *See Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 347 (S.D.N.Y. 2014) ("The Court cannot resolve such a factual dispute on a motion to dismiss but must take the plaintiffs' allegations as true.").  In any case, my analysis below and the conclusion that Plaintiffs have raised a pure breach of contract claim applies equally to E*TRADE's failure to disclose whether the securities transacted were hard-to-borrow.

exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

### IV. Discussion

Defendant E*TRADE argues that the Complaint should be dismissed in its entirety because (1) Plaintiffs' breach of contract claim is barred by Securities Litigation Uniform Standards Act ("SLUSA"); and (2) Plaintiffs fail to plead breach of contract. (MTD[4] 3.) I am not persuaded by either argument.

#### A. *SLUSA Preemption*

#### 1. Applicable Laws

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") to prevent "meritless class actions that allege fraud in the sale of securities." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 122 (2d Cir. 2003) (citation omitted). PSLRA imposes "more stringent pleading requirements and mandatory discovery stays on securities fraud class actions filed in federal courts." *Id*. (footnote omitted). However, after the enactment of PSLRA, litigants began to bring securities class actions in state courts where they alleged state law claims involving nationally traded securities. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006). To address this apparent effort by litigants to avoid the requirements and objectives of the PSLRA, Congress enacted SLUSA. *See id*. "SLUSA precludes private parties from filing in federal or state court (1) a covered class action (2) based on state law claims, (3) alleging that defendants made 'a misrepresentation or omission of a material fact' or 'used or employed any manipulative or deceptive device or contrivance' (4) 'in connection with' the purchase or sale of (5) covered securities." *Rayner v.*

---

[4] "MTD" refers to Defendant's memorandum of law in support of its motion to dismiss. (Doc. 13.)

*E*Trade Fin. Corp.*, 899 F.3d 117, 119–20 (2d Cir. 2018) (quoting 15 U.S.C. § 78bb(f)(1)).

A state law claim is deemed to be "alleging . . . 'a misrepresentation or omission of a material fact,'" and hence precluded by SLUSA, when it alleges "(1) an explicit claim of fraud or misrepresentation (e.g., common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that sound in fraud." *In re Stillwater Cap. Partners Inc. Litig.*, 851 F. Supp. 2d 556, 568–69 (S.D.N.Y. 2012) (quoting, ultimately, *Xpedior Creditor Tr. v. Credit Suisse First Boston (USA) Inc.*, 341 F. Supp. 2d 258, 261 (S.D.N.Y. 2004)); *see also Merkin v. Gabriel Capital, L.P.*, 817 F. Supp. 2d 346, 359 (S.D.N.Y. 2011) ("Any claim may trigger SLUSA preemption if the basis of that claim sounds in fraud or relies on alleged misstatements or omissions."). A claim "sounds in fraud" when "the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim." *In re Stillwater*, 851 F. Supp. 2d at 568–69. In determining whether a state law claim is precluded by SLUSA, "courts 'must look beyond the face of the complaint to analyze the substance of the allegations made'" so that plaintiffs do not escape SLUSA preemption through "artful pleading." *Merkin*, 817 F. Supp. 2d at 359 (citation omitted). On the other hand, a defendant "may not recast plaintiff's Complaint as a securities fraud class action so as to have it preempted by SLUSA." *Paru v. Mut. of Am. Life Ins. Co.*, No. 04 Civ. 6907(JES), 2006 WL 1292828, at *4 (S.D.N.Y. May 11, 2006).

### 2. Application

E*TRADE argues that Plaintiffs' breach of contract claim is a disguised misrepresentation and/or omission clam, because it essentially alleges that E*TRADE "failed to disclose the cost to short hard-to-borrow securities." (*See* MTD 9.) I disagree.

As an initial matter, E*TRADE did not fail to disclose the borrow rate altogether. Users could obtain the estimated borrow rate from the stock lending department through customer

service.  (Compl. ¶ 25.)  They could also see the total amount of the hard-to-borrow interest on their monthly statements, albeit without the interest being tied to a particular transaction.  (*Id*. ¶ 5–6.)

E*TRADE argues that "Plaintiffs' breach of contract claim hinges on whether E*TRADE did in fact misrepresent and/or fail to disclose the purportedly 'shockingly high' indicative interest rates for hard-to-borrow securities."  (MTD 10.)  This argument misconstrues Plaintiffs' claim.  The success of Plaintiffs' claim does not depend on whether E*TRADE failed to disclose the borrow rate.  Rather, it depends on whether E*TRADE disclosed the rate in the manner promised under the Agreement, i.e. by providing the users with the indicative rate at the time they previewed their short sale orders, instead of only disclosing the rate upon users' inquiry or on the monthly statements.  In other words, a fair reading of the Complaint demonstrates that Plaintiffs simply allege that they did not receive what was contracted for with E*TRADE.  Therefore, Plaintiffs' contract claim is not precluded by SLUSA.

Further, E*TRADE did not conceal its failure to timely disclose the higher interest rate.  Although what E*TRADE ultimately disclosed on the users' monthly statements was not the specific interest rate for each hard-to-borrow transaction, but rather a lump-sum interest amount incurred during the billing period on hard-to-borrow transactions, (Compl. ¶ 5), the users were nevertheless put on notice that they had transacted hard-to-borrow securities and incurred the higher interest rate.  When Plaintiffs saw such interest charges on their monthly statements, it would have been immediately apparent to them that E*TRADE breached the Agreement.[5]  In contrast, in the cases E*TRADE cites to that support its argument that a breach of contract claim

---

[5] E*TRADE customers would also have been aware of a breach if they were shown a preview screen indicating that they were contemplating a transaction involving hard-to-borrow securities but were not provided with an indicative rate at the same time.

involving nondisclosure of information can be precluded by SLUSA, the alleged breach of contract was part of a fraudulent scheme where either the breach was not apparent to the plaintiffs or the defendants actively concealed the breach. For example, in *Northstar Financial Advisors, Inc. v. Schwab Investment.*, 904 F.3d 821 (9th Cir. 2018), a non-binding decision, the company allegedly promised its investors to employ a particular investment strategy, reaffirmed that investment strategy during the class period, but deviated from that strategy during the class period without ever informing the investors. *Id*. at 831. In *Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010), the defendant financial advisors allegedly advised investors "that they had sufficient assets to retire and encouraged them to retire early and take lump sum retirement benefits," which the defendants knew was false, but the investors discovered the advice to be false only after they took the advice and retired early. *Id*. at 516. In *Goldberg v. Bank of America, N.A.*, 846 F.3d 913 (7th Cir. 2017) (per curiam), another non-binding decision, the defendant bank kept fees for its own benefit that exceeded the fee rates disclosed in the contract schedule and hid those fees from the investors, who did not learn of such fees until the successor of the bank notified them that the fees were canceled. *Id*. at 915. In these cases, the investors' breach of contract "claims [were] only possible because of the defendants' *concealment* of those breaches" or their failure to disclose such breach. *See, e.g.*, *Northstar Fin. Advisors*, 904 F.3d at 832. Here, Plaintiffs would have become aware of the breach upon making further inquiry or, at the latest, when they received their statements indicating they had been charged hard-to-borrow interest. In other words, E*TRADE did disclose the indicative rate—albeit not in the way outlined in the Agreement—and did not hide the fact that Plaintiffs were charged hard-to-borrow interest.

In addition, the Complaint does not allege that E*TRADE entered the Agreement in bad

9

faith. "[F]ailing to carry out a promise . . . does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *In re Stillwater*, 851 F. Supp. 2d at 573 (internal quotation marks and citation omitted).  E*TRADE claims that courts "have repeatedly held that claims premised on the failure to disclose material information regarding the cost and/or fees" fall within SLUSA.  (MTD 9).  However, the case it cites to for this proposition, *Rayner v. E*TRADE Financial Corp.*, 248 F. Supp. 3d 497 (S.D.N.Y. 2017), involved a defendant who "allegedly had no intention of fulfilling its purported fiduciary obligations." *Id.* at 502.  This case materially differs from *Rayner* because Plaintiffs do not allege that E*TRADE ever "secretly intended not to perform or knew that [it] could not perform," *In re Stillwater*, 851 F. Supp. 2d at 573, nor do they allege that E*TRADE was a fiduciary.  In fact, "New York law does not allow a plaintiff to assert a breach of contract claim and a fraud claim grounded on the same set of underlying events." *Hirsch v. Columbia Univ.*, 293 F. Supp. 2d 372, 379 (S.D.N.Y. 2003).  Instead, in order to assert a fraud claim arising out of a contractual relationship a plaintiff must either:  (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (internal citations omitted).  Here, Plaintiffs have not engaged in "artful pleading" since they only alleged facts giving rise to a contract claim, and they could not have asserted a fraud claim arising out of the same facts.

Plaintiffs do not allege any legal duty independent from the contractual obligation to provide the hard-to-borrow rates.[6]  As noted above, under New York law, "a simple breach of

---

[6] Neither has E*TRADE pointed to any such legal duty.

contract is not to be considered a tort unless a defendant "demonstrate a legal duty separate from the duty to perform under the contract". *Bridgestone/Firestone*, 98 F.3d at 20.  E*TRADE's obligation to provide its users with hard-to-borrow rates stems solely from the Agreement, and as such does not constitute a fraud claim.

To summarize, Plaintiffs do not allege that E*TRADE intended not to perform the Agreement, concealed its breach of the Agreement, or otherwise violated a legal duty that is independent from the duty to perform the Agreement.  Therefore, they do not allege "misrepresentation or omission of a material fact" for purposes of SLUSA, and SLUSA does not preclude their claim.  Consequently, I need not address other elements of SLUSA preclusion.

### B. *Failure to State a Claim*

"To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  To establish damages, a plaintiff must prove causation, i.e. that "defendant's breach *directly and proximately* caused his or her damages." *Id*. (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)).

E*TRADE's argument that Plaintiffs have failed to state a breach of contract claim is based on the premise that "[t]he only way [Plaintiffs' claims can survive SLUSA preclusion] . . . is if . . . the non-disclosure [of the interest rate] was immaterial to their decision to sell the securities."  (MTD 11.)  According to E*TRADE, if the non-disclosure was immaterial to Plaintiffs' decision to trade, then the breach of contract claim inevitably fails because any damages Plaintiffs had suffered could not have been caused by the non-disclosure of the interest rate.  This argument is flawed.

11

First, as I explained above, Plaintiffs' claim survives SLUSA preclusion because it does not involve misrepresentation or fraud.  Second, Plaintiffs do not explain how the failure to sufficiently allege damages violates the elements necessary for SLUSA preclusion.  In other words, for the purpose of determining whether SLUSA precludes Plaintiffs' claim, it is irrelevant whether the hard-to-borrow interest rates were material in Plaintiffs' decisions to trade.  Third, independent of the SLUSA analysis, Plaintiffs' allegations that they suffered damages are sufficient at this stage of the case since they allege, among other things, that (1) the base margin rate was 7.75%, "with the rate declining as the amount borrowed increases," (Compl. ¶ 12); (2) "the interest rate in many instances is shockingly high;" and (3) such rates were "much higher than the fee schedule that [ E*TRADE] makes available online to its customers, which is what customers agree to pay," (*id*. ¶ 3).  Moreover, even if, as E*TRADE claims, Plaintiffs would have placed the short sale orders even if they had been shown the indicative rate, (MTD 12), such fact-laden determination regarding causation of damages is inappropriate at the motion to dismiss stage.  *See In re Sept. 11 Prop. Damage & Bus. Loss Litig.*, 468 F.Supp.2d. 508, 531 (S.D.N.Y. 2006); *see also Refco Inc. Sec. Litig. v. Aaron*, 826 F. Supp. 2d 478, 515 (S.D.N.Y. 2010) ("Questions of proximate cause are generally left to the jury.").

Therefore, I find that Plaintiffs plausibly plead damages resulting from E*TRADE's breach of contract.  Because E*TRADE does not otherwise challenge the existence of the contract or the breach of the contract, I find that the Complaint survives E*TRADE's motion to dismiss for failure to state a breach of contract claim.

V.     **Conclusion**

For the reasons stated above, Defendant E*TRADE's motion to dismiss is hereby DENIED.  IT IS FURTHER ORDERED that E*TRADE shall file its answer to Plaintiffs'

Complaint on or before February 10, 2022. The Clerk is respectfully directed to terminate the open motions at Docs. 12 and 30.

SO ORDERED.

Dated: December 9, 2021
      New York, New York

                                       Vernon S. Broderick
                                       United States District Judge